GLENDALE FEDERAL SAVINGS AND LOAN ASSOCIATION, a Federally Chartered Association, Plaintiff,

v.

David H. FOX, etc., et al., Defendants.

FEDERAL HOME LOAN BANK BOARD, Cross-Claimant,

v.

Richard T. SILBERMAN, as Secretary of the Business and Transportation Agency of the State of California, Cross-Claim Defendant.

No. 77–3274–WMB.

United States District Court, C. D. California.

Nov. 1, 1978.

G. Howden Fraser/Terry O. Kelly, McKenna & Fitting, Los Angeles, Cal., for plaintiff.

Harold B. Shore, Washington, D. C., for Federal Home Loan Bank Bd.

W. Gary Kurtz, Deputy Atty. Gen., Los Angeles, Cal., for defendants.

## ORDER

WM. MATTHEW BYRNE, Jr., District Judge.

The question presented by this motion for partial summary judgment is whether state regulation of the validity and exercisability of "due-on-sale" clauses contained in loan instruments of federal savings and loan associations executed on or after June 8, 1976, is preempted by federal law. A "due-on-sale" clause provides the lender an option to declare immediately due and payable all of the sums owed to the lender if all or any part of the real property securing the loan is sold or otherwise transferred by the borrower without the lender's prior consent.

## I  BACKGROUND

Glendale Federal, the plaintiff, is a federally chartered savings and loan association organized and operating under the Home Owners' Loan Act of 1933, as amended, 12 U.S.C. Section 1461, *et seq.* (hereinafter "HOLA"). The Federal Home Loan Bank Board (hereinafter "the Bank Board"), defendant and cross-claimant, is an independent agency of the United States in the Executive Branch, 12 U.S.C. § 1437(b), which, under authority delegated by Congress through Section 5(a) of the HOLA, is responsible for the chartering, examining, supervision, and regulation of federal savings and loan associations. 12 U.S.C. § 1464(a).[1]

The Bank Board has promulgated specific regulations regarding provisions which a federal savings and loan association shall and may include in its loan contracts. 12 C.F.R. § 545.6–11. With respect to the use of due-on-sale clauses by federal savings and loan associations the Bank Board, in April, 1976, adopted certain amendments specifically authorizing the use of such clauses and prescribing certain limitations on their exercise. 12 C.F.R. § 545.6–11(f) and (g). These regulations, which became effective June 8, 1976, state in pertinent part:

"A federal association continues to have the power to include, as a matter of contract between it and the borrower, a provision in its loan instruments whereby the association may, at its option, declare immediately due and payable all of the sums secured by the association's security instrument if all or any part of the real property securing the loan is sold or transferred by the borrower without the association's prior written consent. Except as provided in paragraph (g) of this

---

1. Section 1464(a) of Title 12, United States Code, provides:

   "In order to provide local mutual thrift institutions in which people may invest their funds and in order to provide for the financing of homes, the Board is authorized, under such rules and regulations as it may prescribe, to provide for the organization, incor-

   poration, examination, operation, and regulation of associations to be known as 'Federal Savings and Loan Associations', and to issue charters therefor, giving primary consideration to the best practices of local mutual thrift and home-financing institutions in the United States."

section . . . exercise by an association of such an acceleration option (hereafter called a due-on-sale clause) shall be governed exclusively by the terms of the contract between the association and the borrower . . . ." 12 C.F.R. § 545.6–11(f).[2]

Defendants Fox, DeClercq, and Silberman are, respectively, the Real Estate Commissioner of the State of California, a Deputy Real Estate Commissioner of the State of California, and the Secretary of the Business and Transportation Agency of the State of California. California real estate law requires that the Commissioner of Real Estate examine any proposed "subdivision,"[3] and, unless there are grounds for denial, issue to the subdivider a public report authorizing the sale or lease in California of the lots or parcels within the "subdivision."[4] The sale or lease, or offer for sale or lease, of any lots or parcels contained in a "subdivision" without first obtaining such a public report is prohibited.[5] In connection with the examination of proposed subdivisions, the Real Estate Department requires

that the developer of such subdivision identify any lender that will be providing take-out loans to prospective purchasers and submit to the Department sample copies of the lender's notes, deeds of trust, mortgages or other security instruments to be executed in connection with such take-out loans.[6]

In late June or early July, 1977, Glendale Federal agreed with the developer of a partially constructed forty unit condominium project located in California (the "Casa del Rey Project") to provide take-out loans to prospective purchasers of the units. Shortly thereafter, the developer of the Casa del Rey Project notified defendant DeClercq of the Department of Real Estate that Glendale Federal would be providing take-out loans to purchasers of units in the project and provided to DeClercq sample forms of Glendale Federal's standardized notes and deeds of trust.

In early August, 1977, Glendale Federal was contacted by a representative of the Casa del Rey Project and advised that the Department of Real Estate had determined

2. 12 C.F.R. § 545.6–11(g) provides:
   "(1) With respect to any loan made after July 31, 1976, on the security of a home occupied or to be occupied by the borrower, a Federal association may not exercise a due-on-sale clause based on any of the following:
   (a) Creation of a lien or other encumbrance subordinate to the association's security instrument;
   (b) Creation of a purchase money security interest for household appliances;
   (c) Transfer by devise, descent, or by operation of law upon the death of a joint tenant;
   (d) Grant of any leasehold interest of three years or less not containing an option to purchase.
   (2) With respect to any loan made after July 31, 1976, on the security of a home occupied or to be occupied by the borrower, no Federal association shall impose a prepayment charge or equivalent fee in connection with the acceleration of the loan pursuant to the exercise of a due-on-sale clause.
   (3) With respect to any loan made after July 31, 1976, on the security of a home occupied or to be occupied by the borrower, a Federal association shall have waived its option to exercise a due-on-sale clause as to a specific transfer if, prior to that transfer the association and the person to whom the property is to be sold or transferred (the

existing borrower's successor in interest) reach written agreement that the credit of such person is satisfactory to the association and that the interest payable to the association on sums secured by its security instrument shall be at such rate as the association shall request. Upon such written agreement and resultant waiver, the association shall release such existing borrower from all obligations under the loan instruments, and for purposes of § 541.14(a), the association shall be deemed to have made a new loan to such existing borrower's successor in interest."

3. California Business and Professions Code § 11000.

4. California Business and Professions Code § 11018 provides, in pertinent part:
   "The Real Estate Commissioner shall make an examination of any subdivision, and shall, unless there are grounds for denial, issue to the subdivider a public report authorizing the sale or lease in this State of the lots or parcels within the subdivision."

5. California Business and Professions Code § 11018.2.

6. *See* Regulations of the Real Estate Commissioner, Title 10 California Administrative Code, § 2792.6

that the standardized note and deed of trust forms of Glendale Federal were "illegal" and that Glendale Federal could not serve as the take-out lender on the project unless its note and deed of trust were revised. Thereafter, Glendale Federal was provided by the developer with a letter authored by DeClercq stating that "the sample form note and deed of trust do not conform to California Civil Code Section 2924.6," which limits the exercisability of the due-on-sale clause.[7] Concurrent with Glendale Federal's receipt of DeClercq's letter, the association received written notice from the developer that in light of the position taken by the Department of Real Estate it would be unable to use Glendale Federal as the take-out lender on the Casa del Rey Project or on another project planned by the same developer.

Plaintiff Glendale Federal brought this action for declaratory and injunctive relief on August 30, 1977. Glendale Federal alleges that defendants failed to issue a public report in several instances because the sample notes and deeds of trust provided to the developer by Glendale Federal did not conform to California Civil Code § 2924.6. Plaintiff seeks a judgment declaring that federal law exclusively governs the validity and exercisability of the "due-on-sale" clause utilized by Glendale Federal in its loan instruments, and an injunction restraining defendants from refusing to issue a public report under the Subdivided Lands Act, or refusing to act on an application for such a public report, on the ground that the notes or deeds of trust of Glendale Federal do not conform to California Civil Code § 2924.6.

The crux of plaintiff's and cross-claimant's argument is that regulation of due-on-sale clauses in the loan instruments of federal savings and loan associations is preempted by federal law, and that defendants therefore may not refuse to issue a public report under the Subdivided Lands Act on the ground that the notes and deeds of trust of Glendale Federal do not comply with provisions of California law governing due-on-sale clauses. Defendants contend that the laws of the State of California pertaining to exercise of the due-on-sale clause apply to federal as well as state-chartered savings and loan associations located in California.[8]

Prior to June 8, 1976, the Bank Board had no regulation which specifically mentioned due-on-sale clauses. The Bank Board did have a regulation in effect from 1948 which

---

7. California Civil Code § 2924.6 provides:

"(a) An obligee may not accelerate the maturity date of the principal and accrued interest on any loan secured by a mortgage or deed of trust on residential real property solely by reason of any one or more of the following transfers in the title to the real property:

(1) A transfer resulting from the death of an obligor where the transfer is to the spouse who is also an obligor.

(2) A transfer by an obligor where the spouse becomes a co-owner of the property.

(3) A transfer resulting for a decree of dissolution of the marriage or legal separation or from a property settlement agreement incidental to such a decree which requires the obligor to continue to make the loan payments by which a spouse who is an obligor becomes the sole owner of the property.

(4) A transfer by an obligor or obligors into an inter vivos trust in which the obligor or obligors are beneficiaries.

(5) Such real property or any portion thereof is made subject to a junior encumbrance or lien.

(b) Any waiver of the provisions of this section by an obligor is void and unenforceable and is contrary to public policy.

(c) For the purposes of this section, 'residential real property' means any real property which contains at least one but not more than four housing units.

(d) This act applies only to loans executed or refinanced on or after January 1, 1976."

8. California Civil Code § 2924.6, supra note 8, specifically limits the exercisability of due-on-sale clauses. The California Supreme Court recently addressed the question whether enforcement of a due-on-sale clause, contained in a deed of trust securing real property, upon an outright sale of that property, constitutes an unreasonable restraint on alienation in violation of California Civil Code § 711. Wellenkamp v. Bank of America, Cal., 148 Cal.Rptr. 379 (1978). The court held that "a due-on clause contained in a promissory note or deed of trust cannot be enforced upon the occurrence of an outright sale unless the lender can demonstrate that enforcement is reasonably necessary to protect against impairment to its security or the risk of default." Id. at 385–86.

specifically required that each "loan contract" of a federal savings and loan association "shall provide for full protection to the Federal association." 12 C.F.R. § 545.6–11 (1975). The Bank Board construed that version of 12 C.F.R. § 545.6–11 as authorizing due-on-sale clauses. *See* Advisory Opinion of Federal Home Loan Bank Board, Resolution No. 75–647, *In The Matter of Schott v. Mission Federal Savings and Loan Association.* Glendale Federal and the Bank Board contend in this action that this regulation and the scheme of regulation by the Board prior to June 8, 1976, precluded the application of California law to limit the exercisability of due-on-sale clauses in loan instruments of federal associations. This contention is not before the court on this motion, and the court expresses no view as to its merit. This motion seeks only a declaration that the Bank Board's present regulation respecting due-on-sale clauses, 12 C.F.R. § 545.6–11(f) and (g), exclusively governs the validity and exercisability of those clauses contained in loan instruments executed by federal associations on or after June 8, 1976. The court, for the reasons set forth below, concludes that 12 C.F.R. § 545.6–11(f) and (g) have, since June 8, 1976, preempted state regulation of due-on-sale clauses in the loan instruments of federal associations.

## II  THE DOCTRINE OF PREEMPTION

■ The doctrine of federal preemption stems from the Supremacy Clause of the Constitution: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . ." U.S.Const. art. VI, cl. 2. Under that clause, "[o]ccupation of a legislative 'field' by Congress in the exercise of a granted power is a familiar example of its constitutional power to suspend state laws." *Parker v. Brown,* 317 U.S. 341, 350, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1942). When such preemption occurs, any state law is inapplicable to an issue which arises in that "field." *Meyers v. Beverly Hills Federal Savings and Loan Ass'n,* 499 F.2d 1145, 1146 (9th Cir. 1974).

The Supreme Court has indicated that when a State's exercise of its police power is challenged under the Supremacy Clause, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977); *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978). The relevant inquiry is whether Congress has either explicitly or implicitly declared that the States are prohibited from regulating the loan instruments of federal savings and loan associations chartered by the Federal Home Loan Bank Board. *See Ray v. Atlantic Richfield Co., supra,* 98 S.Ct. at 994. As the Court stated in *Rice, supra,* 67 S.Ct. at 1152:

"[The Congressional] purpose may be evidenced in several ways. The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. * * * Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws of the same subject. * * * Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose. * * *" *Accord, Ray v. Atlantic Richfield Co., supra,* 98 S.Ct. at 994; *City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 633, 93 S.Ct. 1854, 1859, 36 L.Ed.2d 547 (1973).

■ Even if Congress has not entirely foreclosed state legislation in a particular area, a state statute is void to the extent that it actually conflicts with a valid federal statute. *Ray v. Atlantic Richfield Co., supra,* 98 S.Ct. at 994. A conflict exists "where compliance with both federal and state regulation is a physical impossibility . . . ," *Florida Lime & Avocado Grow-*

*ers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or where the state "law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941); *Jones v. Rath Packing Co., supra*, 97 S.Ct. at 1310, 1316–17; *Ray v. Atlantic Richfield Co., supra*, 98 S.Ct. at 994–95.

With this framework in mind, the court turns to the legislative history of the Home Owner's Loan Act and the regulatory scheme established by Congress under that Act.

### III  THE HOLA AND CONGRESSIONAL INTENT

In 1932, Congress enacted the Federal Home Loan Bank Act in an effort to ameliorate the prevailing emergency in home financing. It created a new federal administrative agency, the Federal Home Loan Bank Board, and directed that agency to charter a series of twelve Federal Home Loan Banks that would serve as wholesale banks for member financial institutions and make mortgage loans directly to members of the public. 47 Stat. 725 (1932), *codified at* 12 U.S.C. § 1421 *et seq.*

In spite of this legislation, the nation's home financing system continued to deteriorate. By 1933, it was estimated that 40% of all home loans in the United States were in default.[9] In response to this crisis, Congress enacted the Home Owners' Loan Act of 1933, the purposes of which were:

> "To provide emergency relief with respect to home mortgage indebtedness, to refinance home mortgages, to extend relief to the owners of homes occupied by

them and who are unable to amortize their debt elsewhere, to amend the Federal Home Loan Bank Act, to increase the market for obligations of the United States and for other purposes." Preamble to HOLA, 48 Stat. 128 (1933).

It appears that the crisis to which Congress addressed itself in the HOLA was at least in part a result of ill-advised state practices in home financing.[10] One commentator has stated that "the states had developed a hodgepodge of savings and loan laws and regulations, and Congress hoped that [Bank Board] rules would set an example for uniform and sound savings and loan regulations." T. Marvell, *The Federal Home Loan Bank Board*, p. 26 (1969). Congressional concern that pernicious state savings and loan practices be suppressed, and that the Bank Board be given broad discretion to establish uniform and sound practices, is reflected in the language of the statute and its legislative history.

The HOLA had basically three components. First, it repealed § 4(a) of the Bank Act, thereby eliminating direct loans to homeowners by the Federal Home Loan Banks. 48 Stat. 128, c. 64, § 4 (1933). Second, a new corporation, the Home Owners' Loan Corporation, was created and authorized to exchange its bonds for mortgages held by various financial intermediaries including state-chartered building and loan associations. 48 Stat. 128, c. 64, § 4 (1933) (repealed 80 Stat. 648, § 8(a) (1966)). The only mortgages eligible for such exchange were those which called for direct payment in equal monthly installments. Loans which called for balloon payments, rollover of principal at specified intervals, or repayment by sinking funds were ineligible, de-

---

9. Federal Home Loan Bank Board, *The Federal Home Loan Bank System*, p. 17 (1971); *see* Thomas B. Marvell, *The Federal Home Loan Bank Board*, pp. 18–19 (1969).

10. These practices included the use of "sinking fund" loans. Under the terms of these loans, "principal payments were first accumulated in a compulsory savings account until the balance, together with any dividends which had been credited to the account, equalled the amount of the loan, at which time the loan was

paid off. Among the disadvantages of this plan were that the loan took longer to mature than expected if dividend rates were reduced, share values could be written down in case of reorganization, and entire share accounts could be sacrificed in case of liquidation, including those required by borrowers. The borrower, however, still owed the full amount of the mortgage." Stanford Research Institute, *The Savings and Loan Industry in California*, Section III–37 (1960).

spite the fact that such loans were in widespread use throughout the United States at the time by state-chartered savings and loan associations. The mortgage exchange program thus had, as one of its effects, the discouragement of state practices concerning the form of mortgage loan contracts and their replacement with contracts conforming to a uniform federal standard.

Third, and most significantly to this motion, the HOLA created a system of federal savings and loan associations. In creating that system, Congress could have elected to subject the operation of federal associations to state law. Instead, Congress, in section 5(a) of the HOLA, gave the Bank Board plenary authority over the creation and operation of federal associations:

"In order to provide local mutual thrift institutions in which people may invest their funds and in order to provide for the financing of homes, the Board is authorized, under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as "Federal Savings and Loan Associations", and to issue charters therefor, giving primary consideration to the best practices of local mutual thrift and home-financing institutions in the United States." 12 U.S.C. section 1464(a).

Federal savings and loan associations were not to be operated and regulated by what a particular state conceived to be the "best practices." Rather, the Bank Board was delegated by Congress the authority to select from the prevailing practices in all the states what it deemed the best practices and to prescribe a nationwide system of operation, supervision, and regulation which would apply to all federal associations.[11]

In *Central Savings and Loan Ass'n of Chariton, Iowa v. Federal Home Loan Bank Board*, 293 F.Supp. 617 (S.D.Iowa 1968), aff'd, 422 F.2d 504 (8th Cir. 1970), the district court sustained the Bank Board's authority to authorize a federal association's use of mobile facilities, even though such practices were prohibited by state law. 293 F.Supp. at 621–22. The Eighth Circuit affirmed, stating that:

"Certainly that statutory language [in 12 U.S.C. section 1464(a)] does not bind the Board inexorably to existing and past practices of local mutual thrift and home-financing institutions." 422 F.2d at 506.

In *Lyons Savings and Loan Ass'n v. Federal Home Loan Bank Board*, 377 F.Supp. 11, 17–18 (N.D.Ill.1974), the court gave a similarly broad construction to section 5(a):

"[T]he HOLA directs the Board to give 'primary consideration to the best practices of local mutual thrift and home-financing institutions in the United States.' . . . the courts have construed this language as vesting discretion in the Board to determine first, what the 'best practices' are, and second, to implement them on a *nationally uniform basis.* The fact that any particular state has not adopted for its own institutions what the Board deems to be a 'best practice' cannot limit the Board's authority without undermining this fundamental purpose of the statute." (emphasis in original)

---

11. This conclusion is supported by statements made in conjunction with passage of the HOLA. Testifying at hearings on HOLA held by the U. S. House Committee of Banking and Currency, April 20, 1933, the Chairman of the Bank Board, William F. Stevenson, elaborated on the Board's authority to prescribe regulations:

"A good many people think we ought to put all the state regulations, what they ought to do and all that kind of thing, in here. But that is left to regulation by the board, who will put the most expert building and loan authorities on it to provide those regulations, so that the regulations can be varied. In some states you have to deal with them one way and in other states another way, and we want the latitude allowed to fit the regulations of the board and the associations to the state law and the different needs." Hearings on HOLA, H.R. 4980, before House Comm. on Banking and Currency, 73rd Cong. 1st Sess. 7 (April 20, 1933) (Statement of William F. Stevenson, Chairman, Federal Home Loan Bank Board).

Representative Luce, one of the managers of the bill, noted in his testimony that "we give the [Bank Board] great power to administer the act." 77 Cong.Rec. 2480, 2573–74 (April 27, 1933).

Congress gave the Bank Board wide discretion to select or reject any state practices as it deemed necessary or desirable in arriving at a uniform federal savings and loan system. Nothing in the Act or its legislative history suggests the Bank Board was to be bound by or subject to any particular state practice or regulation.

Beyond the express delegation of authority contained in Section 5(a) of the HOLA, the creation in the HOLA of a comprehensive and pervasive scheme of federal regulation of federal savings and loan associations reinforces the conclusion that Congress intended to give the Bank Board complete authority to regulate the area. With limited exceptions, a federal association's operations are totally subject to the rules and regulations of the Bank Board. *See* 12 U.S.C. section 1464. The Bank Board prescribes the manner in which capital may be raised, earnings may be distributed, and withdrawals may be effectuated by a federal association. 12 U.S.C. Section 1464(b)(1). The powers of a federal savings and loan association to borrow, give security, insure notes, bonds, debentures or obligations are wholly prescribed by the Bank Board, 12 U.S.C. Section 1464(b)(2). The Bank Board also regulates the authority of a federal association to make and purchase loans and otherwise invest in real estate. 12 U.S.C. Section 1464(c). Congress granted the Bank Board authority to examine the books and records of all federal associations; to institute cease-and-desist proceedings for a violation of any law, rule, or regulation, or for engaging in an unsafe or unsound practice; and to bring charges against an officer or director of a federal association in order to remove the person from office. 12 U.S.C. Sections 1464(a), (d)(2)(A), and (d)(4)(A). The Bank Board is further authorized to appoint a conservator or receiver to manage the affairs of a federal association; to bring an action to terminate an association's insurance of accounts; and to reorganize, consolidate, liquidate, dissolve or merge federal associations. 12 U.S.C. Sections 1464(d)(6)(A), (d)(11) and 1730. It would have been difficult for Congress to give the Bank Board a broader mandate.

As the Court of Appeals for the Ninth Circuit has stated,

"[P]ursuant to its valid statutory authority, the Federal Home Loan Bank Board has promulgated comprehensive regulations covering all aspects of every federal savings and loan association 'from its cradle to its corporate grave.' *People of State of California v. Coast Federal Savings and Loan Ass'n,* S.D.Cal., 1951, 98 F.Supp. 311, 316." *Meyers v. Beverly Hills Federal Savings and Loan Ass'n,* 499 F.2d 1145, 1147 (9th Cir. 1974).

■ The language, history, structure, and purpose of the Home Owners' Loan Act evidence a clear Congressional intent to delegate to the Bank Board complete authority to regulate federal savings and loan associations and to preempt state regulation. Whenever the Bank Board, pursuant to that plenary authority, promulgates a regulation governing an aspect of the operation of federal savings and loan associations, that regulation governs exclusively and preempts any attempt by a state to regulate in that area.

This conclusion is in accordance with the clear preponderance of authority in this and other circuits. *See Meyers v. Beverly Hills Federal Savings and Loan Ass'n, supra,* 499 F.2d 1145, 1147 (9th Cir. 1974); *Kupiec v. Republic Federal Savings and Loan Ass'n,* 512 F.2d 147, 150 (7th Cir. 1975); *Rettig v. Arlington Heights Federal Savings and Loan Ass'n,* 405 F.Supp. 819, 823 (N.D.Ill. 1975); *City Federal Savings and Loan Ass'n v. Crowley,* 393 F.Supp. 644, 655 (E.D.Wis. 1974); *Lyons Savings and Loan Ass'n v. Federal Home Loan Bank Board, supra,* 377 F.Supp. 11, 17 (N.D.Ill.1974); *Elwert v. Pacific First Federal Savings and Loan Ass'n,* 138 F.Supp. 395, 399–400 (D.Or.1956); *People of California v. Coast Federal Savings and Loan Ass'n,* 98 F.Supp. 311 (S.D.Cal. 1951).

In *People v. Coast Federal, supra,* the California Attorney General sought an injunction and recovery of statutory penalties against a federal savings and loan association for violation of state banking laws on

advertising. 98 F.Supp. at 315. The court found that the HOLA established a uniform national system and that state law could not be applied to the federal association:

> "Not only does the act of Congress [HOLA] which authorized the creation, operation and supervision of federal savings and loan associations by the Home Loan Bank Board, embrace the entire field, but the comprehensive rules and regulations adopted by the Board clearly meet the test of covering the subject matter of the [state] statute. . . .
> It seems clear that Congress has preempted the field, making invalid the state statutes plaintiffs rely upon . . . when attempted to be invoked against a Federal savings and loan association.
>
> .  .  .  .  .
>
> . . . [A]s to federal savings and loan associations, Congress made plenary, preemptive delegation to the Board to organize, incorporate, supervise and regulate, leaving no field for state supervision." 98 F.Supp. at 318–19; *accord Meyers v. Beverly Hills Federal Savings and Loan Ass'n, supra,* 499 F.2d at 1147.

This language of *People v. Coast Federal* has been echoed in decisions regarding federal preemption of state regulation of federal savings and loan associations.[12]

The Ninth Circuit has taken the position that Congress, in the HOLA, delegated to the Bank Board the authority to regulate the operations of federal savings and loan associations to the exclusion of state regulation. In *Meyers,* the court addressed the issue whether a Bank Board regulation specifically covering the area of prepayments of real estate loans, 12 C.F.R. Section 545.6–12(b), exempted federal associations from California law dealing with prepayment penalties. The court held that "federal law preempts the field  . . . , so that any California law in the area is inapplicable to federal savings and loan associations operating within California." 499 F.2d at 1147.

## IV  BANK BOARD'S EXERCISE OF ITS AUTHORITY

Pursuant to the plenary authority delegated to it by Congress, the Bank Board has promulgated specific regulations regarding the provisions which a federal association shall and may include in their loan contracts. 12 C.F.R. § 545.6–11. In particular, the Bank Board has promulgated a regulation specifically confirming the validity of due-on-sale clauses in mortgage loan contracts executed by federal associations. 12 C.F.R. § 545.6–11(f). Further, the Bank Board has specifically provided that the only non-contractual limitations on the exercisability of such clauses are those enumerated in 12 C.F.R. § 545.6–11(g).[13] 12 C.F.R. § 545.6–11(f). The regulations on their face indicate the Bank Board's intent to exercise the authority to preempt delegated to it by Congress and to govern exclusively the validity and exercisability of due-on-sale clauses in the lending instruments of federal associations.

---

**12.** *See, e. g., City Federal Savings and Loan Ass'n v. Crowley, supra,* 393 F.Supp. at 655 ("The Act [HOLA] and the regulations promulgated by the [Bank Board] have been held to establish federal pre-emption over the regulation of federal savings and loan associations and thereby preclude any state legislation from applying."); *Lyons Savings and Loan Ass'n v. Federal Home Loan Bank Board, supra,* 377 F.Supp. at 17 ("[T]he plenary powers given to the Board in the HOLA clearly evidence a Congressional intention to preempt the field, thus precluding any regulation of federal associations by state law.").

The language of these cases suggests that Congress occupied the field so that, even in the absence of Bank Board regulation, the states are precluded from regulating in any way the operations of federal associations. That issue is not before the court on this motion and the court expresses no view as to its merits. However, the breadth of the position taken by these courts lends further support to the more limited conclusion reached in this opinion.

**13.** *See* note 3 *supra.* Section 545.6–11(g) contains the only express limitations on the exercise of due-on-sale clauses by federal associations. However, the Bank Board's Statement of Policy with respect to the use of due-on-sale clauses expresses the Bank Board's view that there may be circumstances other than those described in 12 C.F.R. § 545.6–11(g)(1) where a federal association should consider waiving its contractual right to accelerate. 12 C.F.R. § 556.9.

## 912

The Bank Board expressed its intentions with regard to the preemptive effect of the due-on-sale regulations in the preamble thereto:

"[i]t was and is the Board's intent to have . . . due-on-sale practices of Federal associations governed exclusively by Federal law. Therefore, . . . exercise of due-on-sale clauses by Federal associations shall be governed and controlled solely by § 545.6–11 and the Board's new Statement of Policy. [12 C.F.R. § 556.9]. Federal associations shall not be bound by or subject to any conflicting State law which imposes different . . . due-on-sale requirements, nor shall Federal associations attempt to . . . avoid the limitations on the exercise of due-on-sale clauses delineated in § 545.6–11(g) on the ground that such . . . avoidance of limitations is permissible under State law." Preamble to Bank Board Resolution No. 76–296, dated April 28, 1976.

The Bank Board, in promulgating these regulations, was responding to attempts by states to impose state limitations on federal associations' exercise of due-on-sale clauses. The Board deemed such limitations not to be the "best practices," and therefore specifically authorized due-on-sale clauses and preempted state regulation. In doing so, the Bank Board exercised precisely the kind of discretion that Congress intended to delegate to it in HOLA. State regulation of due-on-sale clauses, contained in the lending instruments of federal associations executed on or after June 8, 1976, is therefore preempted.

## V  CONCLUSION

Plaintiff's and cross-claimant's motion for partial summary judgment is granted. Federal law, including specifically 12 C.F.R. § 545.6–11(f) and (g), exclusively governs the validity and exercisability of due-on-sale clauses included in Glendale Federal's loan instruments executed on and after June 8, 1976. California law on the validity and exercisability of due-on-sale clauses is inapplicable to Glendale Federal's loan instruments executed on and after June 8, 1976.